***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Garner and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award, except for minor modifications. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Garner, with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employee-employer relationship existed between plaintiff and defendant-employer.
3. The named employer is self-insured, and Cambridge Integrated Services is the third party administrator for the employer.
4. The date of the alleged injury by accident is April 30, 2001, when the employee contends she was physically assaulted by Charles Douglas Greene.
5. The following documents may be received into evidence as part of the record:
a. Form 61, dated 06/18/2001;
b. Form 61, dated 07/13/2001;
c. Form 33, dated 07/19/2001;
d. Form 33R, dated 08/15/2001;
e. Defendants' Responses to Plaintiff's First Requests for Production;
f. Incident Plaintiff's recorded statement, dated 06/13/2001;
g. Asheville Police Department Incident Report; and,
h. Security Department Report
6. The transcripts of the District Court and Superior Court trials may be received into the evidence of this matter.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACTS
1. On April 30, 2001, the parties were bound by and subject to the provisions of the North Carolina Workers' Compensation Act.
2. On April 30, 2001, plaintiff was employed as a cancer analyst for Mission St. Joseph ("Mission"), where she had been employed for over 15 years. Plaintiff's job was primarily administrative in nature, and involved performing analysis of cancer data and statistics primarily in her office. Her average weekly wage was $556.00, which yields a compensation rate of $370.68 per week.
3. On April 30, 2001, plaintiff arrived for work at approximately 6:00 a.m. to begin her regular work duties, which required gathering statistical information by visiting the morgue to verify if any deaths that occurred over the weekend were due to cancer. Plaintiff's job duties required that she carry business records to the morgue, including a list of recent deaths. Plaintiff was required to verify the cause of death. This job duty was confirmed by co-worker Tara Lewis, who had trained plaintiff.
4. At approximately 7:15 a.m., plaintiff left her regular office and headed for the morgue, carrying the list of deaths. As she waited for the elevator on the first floor, plaintiff was approached by a male wearing green hospital scrubs. He did not have a nametag. The male called plaintiff by another name, and he reached out and grabbed her breasts. Plaintiff thought she saw someone in the stairwell, broke away from the assailant, and ran into the stairwell where she expected to find co-workers. Plaintiff ran up the stairs with the assailant chasing her and grabbing her by the buttock and groin. Plaintiff made it to the second floor door, where the assailant again grabbed her. She was able to get the door open causing plaintiff to fall into the arms of A.J. Ward, a co-worker who was walking by while showing a visitor to the cafeteria.
5. As plaintiff fell into Mr. Ward's arms, she exclaimed to Mr. Ward that she did not know the man who was after her. Mr. Ward testified that plaintiff was "shaky," and appeared to be emotionally upset or disturbed by the encounter. He testified that as plaintiff fell into his arms, he saw the male assailant who had pursued her. Mr. Ward demonstrated at hearing before the Deputy Commissioner that he witnessed the assailant reaching for plaintiff with outstretched arms. The assailant ran away from plaintiff and Mr. Ward.
6. Mr. Ward, who had been employed with Mission for 21years at the time of hearing before the Deputy Commissioner, observed the plaintiff to be stiff, tight, tearful, shaking, and testified that she could hardly talk. He felt that she was devastated. Mr. Ward attempted to calm the plaintiff. He then attempted to locate the assailant, who he observed to be running through the lobby toward the hospital door. Mr. Ward was unable to reach the assailant. Plaintiff then returned to her office.
7. At 7:35 a.m., approximately five security personnel, including Tommy Bradley, arrived at plaintiff's office, where they interviewed her in the hallway. Mr. Bradley described the plaintiff as upset and anxious, observing her to continuously rub her hands together. The security personnel's primary focus was to obtain a description of the assailant so they could search for him and secure the premises.
8. By approximately 7:45 a.m., after concluding their brief interview, the security personnel dispersed to search the hospital premises for the assailant.
9. According to hospital time records, plaintiff's co-worker, Tara Lewis, arrived at the shared office where she found plaintiff. Ms. Lewis observed plaintiff to be shaken up, and alone in the office filling out a security incident report. Plaintiff reported to Ms. Lewis what had happened. Ms. Lewis did not observe any bruising on plaintiff.
10. Plaintiff's supervisor, Rick Righi, arrived at the office between 8:00 and 8:15 a.m. Mr. Righi observed and described plaintiff as "upset" and "out of sorts," and offered to let plaintiff call her husband; however, she indicated he was working out of town and declined the offer. Mr. Righi did not observe any bruising on the plaintiff.
11. At 11:05 a.m., plaintiff called the Asheville Police Department, reporting that she had been assaulted in the hospital when a man grabbed her breasts. At no time did personnel or security from defendant call or contact the police.
12. Later in the afternoon on April 30, 2001, plaintiff was observed in the parking deck by a co-worker and was described as having "blood running down her hand" and appeared to be confused and fumbling for her keys. However, this testimony is not accepted as credible.
13. On the morning of May 1, 2001, plaintiff talked to Renee Joiner, defendant's EKG supervisor, who observed plaintiff as emotionally upset, and having bruises on plaintiff abdomen and chest.
14. On the morning of May 1, 2001, plaintiff also talked to Jeri Mitchell, defendant's Director of Endoscopy, who observed plaintiff to be emotionally upset with bruises on her chest, breast and arms. After such meeting, Ms. Mitchell wrote an email to various management employees in which she described plaintiff's account of the assault.
15. On May 1, 2001, plaintiff also met with Ramona Whicello, defendant's Vice President of Nursing, who confirmed that plaintiff reported the incident to her.
16. On May 1, 2001, plaintiff was interviewed by Detective Scott Lunsford of the Asheville Police Department, who observed bruises on plaintiff's chest and abdomen, and reported her to be emotionally upset. Officer Lunsford, who has advanced training in sexual assault investigation, reported that it was not unusual for a sexual assault victim to not recall or report every detail of their assault immediately.
17. During the next days following the assault, plaintiff was observed by Linda Anderson, defendant's Supervisor of Post Op 6 East, who observed bruises on plaintiff's breast and shins, and described plaintiff as "upset and tearful."
18. Subsequent to the assault, defendant Mission published its employee newsletter and reported the plaintiff had "been violently attacked," and "sustained serious bruises and contusions."
19. Subsequent to the assault, Angela Jones, defendant's Safety Officer, met with and observed plaintiff and published an email to staff members confirming that "on April 30, Caroline D'Aquisto was violently attacked [and] . . . suffered severe bruising and contusions."
20. Within the days subsequent to the assault, plaintiff was reported by several co-workers and by Detective Scott Lunsford of the Asheville Police Department to be emotionally upset and tearful. She was also reported to have bruising to her chest, breasts and abdomen. Subsequent to the assault, plaintiff continued to work until May 21, 2001, but continued to have episodes of anxiety, trouble sleeping, and crying spells. During this time period, part of her work duties required her to attend Camp Bluebird, a camp for terminally ill cancer patients, which did not require plaintiff to be in her regular office at the hospital.
21. Prior to the assault of April 30, 2001, plaintiff had suffered from, and was treated for, multiple medical symptoms, including a cervical neck fusion, fibromyalgia-type pain, stress, anxiety, hypertension, chronic pain, and degenerative disk disease. She had also experienced several psychological episodes that were believed to be dissociative episodes related to prior childhood abuse. However, there is no evidence in the record that plaintiff was ever unable to work due to such pre-existing medical or psychological symptoms or conditions.
22. In January 2001, plaintiff was seen by her family physician, Dr. Karen Dedman, and reported trouble sleeping, leg pains, and having fainted twice. Plaintiff also reported being under a significant amount of stress. Dr. Dedman diagnosed her with a severe stress reaction, chronic neck pain, and insomnia, noting, "she has excellent insight into her issues." On a return visit on February 6, 2001, plaintiff was reported to be "tremendously better."
23. On May 21, 2001, plaintiff was notified by Mission security that the alleged assailant had been spotted on the hospital premises, and she was asked to identify him, along with A.J. Ward, the only other eyewitness to the assailant. Upon arriving at the area where the assailant was located, plaintiff was placed directly in front of the assailant without police officers being present and was asked if he was the individual that assaulted her. Plaintiff became very emotionally distraught and fearful. She stated that she could not identify the individual without seeing his teeth, which she had previously described as crooked. Mr. Ward testified that plaintiff became emotionally upset and required assistance by co-workers. Plaintiff was taken to a secure office where Bill Mance, Vice President of Human Resources at Mission, recommended that plaintiff be taken home by MMH security personnel because of her severe emotional condition.
24. Both plaintiff and Mr. Ward subsequently positively identified and notified management of defendant Mission that the individual presented to plaintiff on May 21, 2001, Charles Greene, was the person who attacked and assaulted plaintiff on April 30, 2001.
25. In two criminal trials, plaintiff and Mr. Ward subsequently identified Charles Douglas Greene as the male who had assaulted plaintiff, but Mr. Greene was adjudged to be not guilty in Superior Court. Mr. Greene, who was an authorized temporary employee/sitter working for Diversified Personnel Services at Mission, did not testify at hearing before the Deputy Commissioner. However, he previously denied assaulting plaintiff on April 30, 2001.
26. Regardless of whether or not Mr. Greene was plaintiff's assailant, the Full Commission finds that a man wearing scrubs at Mission had the appearance of a legitimate business purpose in being there. Although the majority of plaintiff's work did occur at her desk, her job duties required her to carry business records to the morgue on a regular basis, causing her to be present in areas of the hospital with few, if any, people in her vicinity. Thus, the Full Commission finds that plaintiff was at an increased risk of being exposed to an assailant not by virtue of her job as a cancer analyst, but rather because of where her job duties took her the morgue and other such places with few, if any, people in her vicinity.
27. On May 25, 2001, upon the referral of and with authorization of Mission's Employee Assistance Network, plaintiff was evaluated by Karen Blicher, LCSW, ASCW, Director of Behavioral Medicine at Mountain Area Health Education Center, who specializes in women's psychological issues, including sexual assault. After her initial assessment, Ms. Blicher stated, "by the end of that first interview it was very clear to me that she was experiencing post traumatic stress disorder of an acute kind," which she testified was based on her personal observations of plaintiff during the interview. Ms. Blicher described plaintiff as being "terrified" and "extremely anxious," and added that plaintiff's "speech and mannerisms were consistent with a post traumatic stress diagnosis." She also found plaintiff's presentation during the evaluation consistent with somebody who had gone through an assault like plaintiff described.
28. Subsequent to the assault, plaintiff also experienced significant frustration and anger at the management of Mission St. Joseph for their failure to completely and accurately report the sexual assault to the staff of the hospital and the fact the assailant had not been apprehended and was potentially still on the hospital property. Ms. Blicher testified that plaintiff's anger was a natural response by a sexual assault victim.
29. Plaintiff returned to see Ms. Blicher on May 29, 2001. Ms. Blicher described plaintiff as being more anxious, as she reported nightmares and sleep disturbances, all of which were associated symptoms of post-traumatic stress disorder. Ms. Blicher recommended that plaintiff take a week off work. She further stated that in her opinion plaintiff was incapable of sustained competitive employment as a result of her post-traumatic stress disorder and panic attacks.
30. On May 29, 2001, plaintiff was evaluated by Dr. Haaskma, Dr. Dedman's partner, who reported diffuse muscle pain and visually observed plaintiff to have "significant bruising of her breasts, abdomen and pelvic area." Dr. Haaskma reported her to be anxious and "understandably upset, crying frequently, and sleeping poorly."
31. Upon the recommendation of Ms. Blicher, plaintiff requested authorization to take a week off of work on May 30, 2001. Rick Righi, plaintiff's supervisor, notified her that she had to receive her 90-day evaluation before leaving. In fact, plaintiff's 90-day evaluation was 60 days overdue. Mr. Righi then presented plaintiff's evaluation, which was less than satisfactory. However, there is no evidence to suggest that plaintiff's job was in jeopardy.
32. On May 31, 2001, plaintiff was evaluated by Dr. Stephen Mendelsohn, a board-certified internist and rheumatologist, who had previously treated her for osteoarthritis and fibromyalgia type pains. Such conditions had remained unchanged and non-disabling for plaintiff during the 10 years of prior treatment with Dr. Mendelsohn. During his treatment prior to the assault, Dr. Mendelsohn described plaintiff as "not a complainer by any means; in fact, somewhat to the opposite of that. She was very stalwart, was very proud to continue working and not missing time from work."
33. During the examination of plaintiff on May 31, 2001, Dr. Mendelsohn reported:
 Her neck was very stiff compared to before [the assault]. She had a lot of muscle spasms around the neck, extending across the shoulders and into her back. She had slight loss of movement of both shoulders. And her upper back and lower back were quite sore. She had diffuse old bruises in her chest wall, and her lower back was quite tender . . . it [the bruises] looked like they were several weeks in age.
Dr. Mendelsohn also observed plaintiff to be:
 . . . fairly upset about recent events, a little shaky, had kind of a fine shake to her whole demeanor. She came across as a victim, which I had never really seen in her before. She was always a pretty strong in-charge person, and this time she was very shy and shaky and tearful at times.
Based on his examination, Dr. Mendelsohn prescribed an anti-depressant medication, continued her anti-inflammatory medication. Additionally, he recommended that plaintiff seek psychological counseling, that she take a leave of absence to get away from the workplace due to "both psychological and physical" conditions, and that she start some physical therapy.
34. Subsequently on June 13, 2001, Dr. Mendelsohn gave plaintiff a written note taking her out of work for 4 weeks, based on her physical injuries that she sustained in the assault, as well her emotional condition.
35. On June 4, 2001, plaintiff was examined by Dr. Dedman, who visually observed "bruising on her breasts and upper abdomen . . . a very large bruise in her left groin that measured nine centimeters in length." Dr. Dedman reported plaintiff's presentation was "very quiet, subdued, not the same person I had seen in the past. Her speech was more truncated and she seemed shaken." Based on the examination Dr. Dedman diagnosed plaintiff with a severe acute stress reaction due to a recent assault and strongly recommended that plaintiff contact a rape crisis center. Dr. Dedman also recommended a psychiatric assessment. Dr. Dedman opined that based on plaintiff's condition, plaintiff was not capable of working because of her severe stress reaction to the assault.
36. Plaintiff returned to Dr. Dedman on June 28, 2001, reporting the onset of panic attacks. At this time Dr. Dedman completed Family Medical Leave documents for plaintiff. On re-examination on July 13, 2001, Dr. Dedman reported plaintiff suffered from left shoulder pain, neck pain, inferior left rib cage pain, panic attacks, and nausea. Plaintiff was seen again on August 27, 2001, reporting a severe panic attack associated with the assailant sitting near her in court.
37. On September 26, 2001, Dr. Dedman reported plaintiff had developed "terrible dermatitis" or cracking of the skin on her feet and hands. Dr. Dedman and testified in opined that such dermatitis was directly caused by her ongoing stressors, including the assault and the criminal proceedings. As a result of plaintiff's condition, Dr. Dedman opined that plaintiff "was still unable to return to her normal employment."
38. Dr. William Anixter, took over treatment of plaintiff's psychiatric conditions in September, 2001, upon the referral of Dr. Karen Dedman. Dr. Anixter is a board-certified psychiatrist with over 20 years of experience in specializing in anxiety disorders, including post-traumatic stress disorder. Based on his examinations and treatment of plaintiff, Dr. Anixter determined:
 It was, in my opinion, a series of events, beginning with the original trauma in the hospital and being strongly exacerbated by a second episode in the hospital when she was brought in close encounter with the man who had assaulted her the first time, and so the two exposures to this fellow and that entire period of time seems to function as one continuous trauma.
39. On examination, Dr. Anixter observed plaintiff to suffer from "terrible episodes of panic, episodes where she would become confused, disoriented. She would get lost. She would have trouble finding her way over familiar terrain. Her concentration was bad. Her sleep pattern was disturbed. She was having episodes of crying spells." Based on his examination, Dr. Anixter stated, "it was not feasible that she could work full time, really anywhere, but I thought she would be able to work again at some point."
40. Dr. Anixter continued to provide ongoing treatment to plaintiff through the date of the hearing before the Deputy Commissioner. He testified that plaintiff continues to suffer from anxiety, depression, panic attacks, nightmare, and sleep disturbance. Dr. Anixter opined that plaintiff continues to be unable to return to work as a result of these symptoms, which are caused by the assault.
41. Dr. Mendelsohn also continued to treat plaintiff through the date of the hearing before the Deputy Commissioner. He reported:
 [S]he still had a fair amount of stiffness in the neck and shoulders. In fact, her left shoulder had gotten quite stiff, and she was barely able to raise it, about halfway up from her shoulders. Her upper and lower back were still somewhat sore, and the rest of her lower extremities were pretty much as they had been before.
In a written statement dated October 15, 2002, Dr. Mendelsohn stated:
 I have been following Caroline D'Aquisto at Asheville Arthritis and Osteoporosis Center since March 1991. She has had mildly inflammatory polyarthritis which has periodically given her flare-ups about the joints. However, over the last year with increasing stresses, this has led to marked muscle spasms, sleeping disturbance problems and depression which have greatly accelerated her pain complaints and have led to complete disability to the point where she is not able to work full time.
42. Dr. Dedman, Dr. Anixter, Dr. Mendelsohn, and Karen Blicher have opined that plaintiff's physical and psychological injuries, symptoms, and conditions have been caused or aggravated by the assault of April 30, 2001, and that as a result of both physical and emotion conditions, plaintiff has not been capable of working since May 29, 2001.
43. Plaintiff attempted to volunteer with the Asheville Humane Society. She was initially placed in the administrative office there for approximately a week, and performed fairly well. However, plaintiff experienced difficulties when she was moved to the animal shelter, where she was required to have more contact with the general public. Ms. Moore described plaintiff as distracted, unable to focus, unable to concentrate, and unable to follow through with activities. Based on plaintiff's inability to perform these duties, the decision was made by the Humane Society staff to discontinue her volunteer efforts.
44. Defendants retained Dr. Claudia Coleman to evaluate plaintiff within several months after the assault. Dr. Coleman initially opined that plaintiff suffered from acute anxiety that was caused by the April 30, 2001, assault. However, based on Dr. Coleman's mistaken assumption that plaintiff had successfully performed 40 hours per week of volunteer work for several months, Dr. Coleman reported plaintiff was capable of working. Because Dr. Coleman's opinion was based upon erroneous information, the Full Commission affords less weight to her testimony.
45. Dr. Coleman performed a subsequent evaluation of plaintiff's medical records, including information regarding plaintiff's prior history of childhood abuse and the dissociative-type episodes that plaintiff had suffered. Based on this information, Dr. Colman opined that plaintiff had suffered a dissociative episode, wherein she imagined she had been assaulted. However, when presented with the actual findings of fact, including the eyewitness testimony of A.J. Ward, Dr. Coleman admitted that the attack could not have been a dissociative episode.
46. Defendants presented no witnesses at hearing before the Deputy Commissioner, and offered only one exhibit (plaintiff's job evaluation) in the three days of hearings. All of the witnesses offered by plaintiff, and their statements, were readily available to defendants to consider in their investigation and subsequent denial of this matter. Most of the 21 documentary exhibits entered into evidence by plaintiff were readily available to defendants for investigation, if one had been properly undertaken. When asked by the Deputy Commissioner why he was defending this case, counsel replied, "We don't know what happened."
47. Defendants possessed documents that confirmed plaintiff accounts of the attack, which they refused to make available to the plaintiff. She was required to file a Motion to Compel to obtain such documents.
48. Defendants offered no testimony or evidence to contradict plaintiff's description of her job duties, including carrying business records with her at the time of the attack.
49. As a result of defendants' failure to perform a reasonable investigation of this matter, and based upon defendants' refusal to admit plaintiff was even assaulted, despite eye-witness testimony, plaintiff was required to prosecute a three day hearing, presenting at least ten witnesses and twenty-one exhibits. Thus, the Full Commission finds defendants' defense of this matter was based on stubborn, unfounded litigiousness.
50. As a result of defendants unreasonable and unjustified defense of his matter, and their pattern and practice of unreasonable defense and bad faith, the Full Commission finds that an award of twenty-five percent (25%) of the total indemnity benefits recovered is reasonable.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On April 30, 2001, plaintiff suffered an injury by accident when she was assaulted on the premises of defendant Mission St. Joseph Heath System. As a direct result, plaintiff sustained emotional injuries that include acute anxiety, post-traumatic stress disorder and depression, and also sustained physical injuries that include aggravation of her fibromyalgia — type pain. N.C. Gen. Stat. § 97-2(6).
2. The assault on plaintiff on April 30, 2001, arose out of and in the course and scope of her employment with defendant, because plaintiff was in the course of her employment carrying business records at the time of the assault, and was assaulted by a man wearing scrubs who appeared to have a legitimate business purpose in being at Mission. Wake Co. Hosp.System v. Safety National Casualty Corp., 127 N.C. App. 33, 39,487 S.E.2d 789, 792 (1997).
3. As a result of the April 30, 2001, injury by accident and resulting disability, plaintiff is entitled to have defendants pay ongoing temporary total disability compensation at a rate of $370.68 per week for the period of May 29, 2001, through the date of the hearing before the Deputy Commissioner and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
4. As a result of the April 30, 2001, injury by accident, and resulting physical and psychological conditions, plaintiff is entitled to have defendants pay for all related medical and psychological treatment that is reasonably necessary to effect a cure, give relief, or lessen plaintiff's disability, including expenses associated with treatment provided by Dr. Dedman, Dr. Anixter, and Dr. Mendolsohn. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
5. Defendants' unreasonable and unfounded denial and defense of this matter justifies an award of attorney fees in the amount of twenty-five percent (25%) of the indemnity compensation hereinafter awarded. N.C. Gen. Stat. § 97-88.1
 ***********
Based on the foregoing Findings of Facts and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff ongoing total disability compensation at a rate of $370.68 per week, for the for the period of May 29, 2001 through the date of the hearing before the Deputy Commissioner and continuing until further order of the Commission. The amounts that have accrued shall be paid to plaintiff in a lump sum. No amount shall be deducted from this award to pay plaintiff's attorney fees. Defendants shall pay interest at the rate of 8% per year from August 23, 2003.
2. Defendants shall pay for all related medical and psychological expenses, including expenses associated with treatment from Dr. Dedman, Dr. Anixter, and Dr. Mendolsohn to the extent such treatment is reasonably necessary to effect a cure, give relief or lessen plaintiff's disability.
3. Dr. Anixter is hereby recognized as plaintiff's authorized treating physician, and shall continue to direct plaintiff's medical and psychological treatment.
4. Defendants shall pay to plaintiff's counsel a reasonable attorney fee in the amount of twenty-five (25%) of the compensation awarded herein, which is assessed as a penalty and sanction pursuant to N.C. Gen. Stat. § 97-88.1. The fee shall not be deducted from the amounts awarded to plaintiff. The portion of this fee that has accrued shall be paid in a lump sum directly to plaintiff's counsel.
5. Defendants shall pay the cost incurred by plaintiff in prosecution of this claim, including deposition costs, and trial transcript costs from the hearing before the Deputy Commissioner and the criminal trial transcript costs that were necessary for preparation and prosecution of this claim.
6. Defendants shall pay the costs of the Commission.
This 15th day of March 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER